Good morning, Your Honors. My name is Gary J. Kauffman. I have the pleasure of representing James Schaefer on appeal. My colleague, Greg Piccinelli, represents Jeffrey Kilbride on appeal. And what we've decided to do with respect to our time allocation, we filed a joint brief, as the Court well knows. I'm going to spend five minutes now. Mr. Piccinelli intends on spending roughly nine minutes, and we're going to try to reserve six minutes for rebuttal. If that's fine. Okay. May I proceed? Sure. I think this case is a heck of a lot more interesting than the attorney fee case. I mean, this case is a – presents new and novel issues that's never, ever been raised in this circuit, and for that matter, anywhere in the land. The primary issue in this case is the obscenity conviction. And distilling that down to its most simple, simple level in this case, notwithstanding the, you know, 80 pages of the government's brief and our briefs, the issues in this case really aren't that complex. We have new facts and old law. The new facts are the Internet. The old law is Miller v. California and its progeny. Now, this case, I didn't try this case, but this case was tried before a very good, very careful district court judge, Judge Campbell. And Judge Campbell in the district court in Phoenix recognized and acknowledged that, gee, this case is a little different. What do we do? We can't just give the normal instruction, at least that's what the court reasoned. We have to do something different because of the Internet age. Because this was the first – this panel right now is hearing the first appeal from a conviction for obscenity not involving child pornography over the Internet. It's a case of first impressions. So what did the district court judge do? Well, Judge Campbell did his best. He's a good judge. He tried to fashion an instruction that he thought would encompass or take care of the best of both worlds. Unfortunately, the result from – for the reason I'm about to tell you is it accomplished neither. This – the law has to be one way or the other. We have to either adhere to existing case law, which is Miller and his progeny, or this court has now the opportunity of creating new law. I'm only going to speak to existing law. I'll let Mr. Piccinelli address the prospects of persuading you, perhaps, to address and create new law. But just using existing case law, here's what we know. There has been no case, not anywhere in this nation, not anywhere in the world, for all I know, where people have been convicted of obscenity, where the community is not just the local community or some reasonable geographic area around that community, but here we had, like, a combination. And it's not a national standard. What the judge did in this case was – it's a hodgepodge. What happened in this case, which is unprecedented, we had a jury who was instructed that they could take into account standards anywhere, places outside, anywhere. And, in fact, what happened in this case from a factual standpoint is the court allowed this jury to hear the personal opinions, not the community standards, but the personal opinions of folks outside the community, outside the district, nothing related to the community. This was not a situation where the court allowed the personal opinion of folks 20 miles away or across the bridge or even down south in Los Angeles, or in this case, Phoenix, Tucson. This is a case where the judge allowed the personal opinions of folks living in Ames, Iowa. Remember, this case was tried in Phoenix, Arizona. Allowed the personal opinions of Boston, Massachusetts. Well, what do we do in these internet cases? Maybe go to the Potter Stewart rule? I know it when I see it? Well, you know, these are tough issues. And I think the issue in this case is not so much, you know, what obscenity is, it's the question of how do you judge it. And existing law is local community standards. And that means there's some nexus to the community. You know, what the courts have not done is say, you know, take a drop from the sky, a big concentric circle, and say, okay, this is your community. It's 37 miles square. Because the courts recognize, and they didn't gerrymander it like some congressional districts to get it the way they want. Because the courts recognize that every community is different. The community here on Mission and 7th may be different than the community on Nob Hill. The community in West Hollywood, California is clearly different from that of Phoenix, Arizona. But what is the Internet community? Well, the Internet community would – that's really Mr. Pitchnell's argument, but it's really – the Internet community is all the jurisdictions. It's really a national standard. Maybe it's international even. Or even international. Because as this Court is well aware, in fact, it's been alleged in this case, a lot of transmissions come from all over the world, from Russia, from Eastern Europe, from Asia. But it's either going to be essentially one standard for all, so someone in West Hollywood, California, isn't judged by the standards of Boise, Idaho, and vice versa. Every community has the same. Now, so to answer Judge Fletcher's question, what do we do, the answer would be, as five, I think, Supreme Court justices have already stated opinions, different opinions, decisions, is that you have one standard, which is basically, as a court says, almost anything goes except that – obviously, child pornography would definitely be out of the question or anything where it involved violence or someone was harmed. But in this case, just on just existing law, because this Court doesn't have to reach the next level, this Court doesn't have to change the law. Mr. Pitchnell's going to invite you to, but this case, this Court does not have to change the law. Just based on existing law, 35 years of existing law, here's what we know. There's been no instruction like this ever anywhere in the United States where it gives the jury the province to accept the personal opinions of people outside the district with no relation whatsoever. Ames, Iowa, Boston, Massachusetts. When the personal opinions in traditional obscenity prosecutions in the last 35 years, the personal opinions of people within the community are not admissible. In this case, you're eating into your co-counsel's time. You said you're going to take 5 minutes? Roughly 5 minutes. So you're now about 6-1⁄2 minutes in. Thank you very much, Your Honor. Mr. Pitchnell. May it please the Court. Good morning, Your Honors. My name is Greg Pitchnell, Pitchnellian-Sarno. Actually, before I get to the issue of a national standard, and at this point I'm not sure if we can actually get to it, I do want to address an issue that has to deal with plain error review in this case. The trial court plainly erred in this case in allowing a jury instruction that was so flawed that it allowed the jury, in fact, to decide a matter of law in this case. And that matter of law in this case was the determination of which community exactly is the community that is to be used for the purposes of applying standards to the charged materials. Even worse, the community did this ex post facto in a criminal case. Under Miller, the scope of the community is geographic, and it is not a question of fact for the jury. It is basically a question for the sovereign. As a matter of fact, the Miller case is all about the issue of could California use a standard that was something less than a national standard. And that case clearly cited on the proposition that the sovereign, the State, the government, is their province to determine what the scope of the community is. The government here contends that the jury is free to determine the scope of the community with no guidance whatsoever. That it can be as a matter of fact, the instruction says it's not geographic, and the jury is supposed to fashion this utilizing society at large, people in general, and to use evidence of communities, a plurality of places outside of the community. This is an amazingly amorphous standard. And in Miller, Miller's Kennedy, what instruction should have been given? The instruction in this case should have been one of two types of instructions. One, it could have been the standard instruction that it was the judicial district in which the materials were sent or the judicial district in which they were received. That would allow a jury that would be in panel that would be assumed to know the community's standards of that district. That's Hamline. Or, because we are now into new territory with the Internet, a more appropriate standard would be a national standard, which is, is countenanced by the Supreme Court's precedence. There's no reason why one could read Miller as foreclosing a national standard. Justice O'Connor had indicated so in the Ashcroft v. ACLU case. With the first possible list indicated, which list would you pick? Well, that – there is some latitude to the prosecutor. But if it were me, are you saying which of the two local communities are an Internet standard or a national standard? Oh, without a doubt, a national standard. Oh, no. You're saying there are two possibilities. Yes. One is a national standard. Yes. The other one is a district standard. Is a district standard, yes. How would you pick that district? Well, the traditional way that that has been done is that it is the district of sending, you know, where the material is actually being sent out of, in the district of receipt, which is where it comes in. And that – Receipt of? That's exactly the reason why community standards applied to an Internet case turns the whole reason for community standards on its head. Justice Berger had indicated in Miller that it is unfair to have the people in Maine or Mississippi be subjected to the standards of what is acceptable in Las Vegas or New York. Things have progressed to the point, because of technology, that that's now entirely turned on its head. Because what happens is, if you use community standards in the Internet world, you are giving an Internet heckler's veto to the most regressive and conservative jurisdiction in the United States. It sounds like if Judge Campbell had chosen to use Arizona as the receiving district and heard witnesses polling from Arizona, your argument would have been it should have been a national instruction. It would have been. And we wouldn't have maybe plain error here, because the plain error here is that juries don't make law. Any part of any kind of criminal law – Judge Campbell could have avoided the plain error, in your opinion, by saying it's the Arizona standard and listened to five or six witnesses from Mesa, Queen Creek. Absolutely. That is totally consistent with Miller and with Hamlin. Yes. That would have been okay. That would have been okay. But in this case, the jury was in – Would that be okay? Well, the reason why – well, it wouldn't, in my opinion, be the way the law should go. But it at least would survive plain error. And that's our issue here. So it's an objection or a counter-instruction. That's what you're saying. Yes. Yes. However, I think that, as Justice O'Connor had opined in Ashcroft, the obscenity of these laws themselves are subject, probably, to facial challenges now on the Internet, simply because of the fact that they're going to be overbroad when you apply – require a speaker on the Internet to comply with the community standards, quite literally, of every community in the country or self-censor. That just doesn't work. So, basically, to conclude the argument here with respect to plain – why there's plain error, juries are not entitled to make the law. They're – what they can do is they can resolve questions of fact. Here, because it is a question of law, which community is to be used? And this jury was invited, incentivized by all the prejudicial evidence of the community standards, in this case, of witnesses from all over the country, to fashion its own amorphous community. And according to Miller, it says, when we ask triers of fact to decide whether the average person applying contemporary community standards would consider the materials purient, it would be unrealistic that the answer be based on some abstract formulation. And that is exactly what we have in this case. I will now turn it back over to Mr. Miller. The question. There was a request for a big screen and a video presentation. What was proposed to be shown? It was not by us. I'll have to defer to government counsel on that. That was my request, Your Honor. I wanted to show the panel demonstratives that were used in trials that helped display e-mail, key information, key addresses, how they work, and the facts of the case regarding e-mail and how it's sent and received and traced. And those facts, I think, in my experience, based on the trial, is that they're complicated. And I wanted to have the opportunity to walk the panel through the same kind of things that I used to explain the facts to the jury. Okay. You've got about six minutes left for rebuttal, and I assume you'll flip a coin, or you've already decided who will do it? Not yet. Not yet. We're going to hear from the United States at this time. Thank you, Your Honors. My name is Jill Trumbull-Harris. I'm an assistant United States attorney in Indiana, but I prosecuted this case while at the Department of Justice, along with my co-counsel, Bonnie Kane, and I'm appearing today on behalf of the United States. I'm glad that Mr. Piccinelli mentioned plain error, because with regard to the obscenity issue, which is the only issue they've chosen to argue and so far that the Court has heard argument on, the question before this Court is whether Judge Campbell committed plain error in giving the instructions he gave. These defendants did not request a national instruction during trial. The instructions that they are now saying they should have been given, they didn't ask for. And as a result of that, the question is, did Judge Campbell commit plain error? And the government's response is, there is no way, it's not possible for Judge Campbell to have committed plain error in this case, because he relied upon Supreme Court precedent, binding Supreme Court precedent that held that a national standard should not apply. And that's the Miller case and the Hamling decision. And I want to direct the Court specifically to Hamling, because I think it's very important. The defendants have framed this case as a case of the Internet. This is not an Internet case where an Internet standard would apply. And the reason is because these defendants purposely chose who to send these messages to that contained the obscene images, who to spam. They obtained these e-mail addresses and they spammed those e-mail addresses. They did that on purpose, by their own fruition. And that's different from setting up a website that anybody can come see and then being subjected to different community standards of the people who come see that website. Hamling, the Hamling decision that the Supreme Court considered is actually directly on point with regard to the facts, because in Hamling, the defendants mailed out brochures and they mailed them from California to places all over the United States, and they were prosecuted, including California. They were prosecuted in California. That is exactly the same as what the defendants did here. They obtained e-mail addresses in Arizona. They e-mailed people from Arizona sitting in various locations in Arizona. They e-mailed people all over the world. And then they were prosecuted for distributing obscenity in Arizona. That's no different from Hamling. And it's not an Internet case, as the defendants have tried to frame this. If that's the case, why were there witnesses as to decency standards from outside Arizona? I'm glad that you asked that question, because the witnesses that you're referring to did not testify as to the standards in the communities where they live. And we have provided for the Court in the record the entire direct examination of those witnesses. And you can review those direct examinations, and you will see we never asked them, what are the standards in Ames, Iowa, for pornography? How do people in Ames, Iowa, feel about pornography? You did ask those witnesses if they considered the material sent to them to be pornographic at all. Well, I think that the material was obviously pornographic. But you did ask them that. Well, we asked them why they complained, because we felt that that was relevant. We had to lay foundation for the complaints to get the complaints that they made into evidence. But we also wanted the jury to understand the context in which the images were received, in that these images were received in people's homes, in people's businesses, at a hospital where a person was visiting a relative who was sick. And it was the fact that these were sent via e-mail in the privacy of people's homes, that context, we wanted the jury to consider based on Ginsburg, United States v. Ginsburg, Supreme Court precedent that said, what is obscene in one context may not be obscene in another. And Ginsburg, again, factually is very similar to this case, because it involved the mailing out of obscene material. And in Ginsburg, the Court said the fact that those images were mailed out into people's homes, that context is relevant and the jury can consider it. And based on that trial, we requested an instruction that the jury should consider the context in which the images were viewed. The defendants aren't raising on appeal that context instruction, aren't claiming that that was inappropriate. And it was for that reason that we presented the testimony of witnesses from all over the country, so the jury could see. Sotomayor was there evidence as to how the e-mail recipients were chosen? Not at trial, Your Honor. There was no evidence regarding that at trial. The defendants claimed it was a targeted marketing campaign. The various witnesses who testified, we asked them whether they had ever subscribed to pornography or expressed an interest in pornography. And the testimony was that some of them had and some of them had not. And there was also testimony that a child, a minor, had also received e-mails from the defendants, and he's incapable of having a credit card that he could use to subscribe to a pornography website. Now, I think it's important to note that because we're looking at Judge Campbell's decision here and we're deciding, was it plain error to give these instructions? Supreme Court precedent directly supported each of the instructions, and all of the And the defendants in this case, because plain error is the analysis that the Court should consider, they have to show that the outcome of this case would have been different if they had been given the instruction they now say they should have been given. And the fact is that they haven't established that the outcome would have been different. When I listen to the argument, I think what facts or what law would they have presented to the jury or argued if a national instruction had been given? And the fact is they simply did not avail themselves of the opportunity to present evidence of standards outside of the District of Arizona. But they could have. They weren't prohibited from. And importantly, they did not object to the testimony of these six witnesses from all over the United States. They never objected to these witnesses' testimony being offered by ‑‑ during trial. Kagan in your indictment, did you make it clear that you were only dealing with the Phoenix area in your indictment? No, Your Honor. The indictment isn't specific to the Phoenix area. I think what the indictment established is that the defendant's conspiracy took place for the most part in the Phoenix area. One of the defendants lived in the Los Angeles area. But most of the conduct for the conspiracy took place in Phoenix. And the indictment makes clear that many hundreds of thousands of people, in fact, over 670,000 people that we know about, that we have saved their complaints regarding the defendant's spam. And that was admitted into evidence and set forth in the indictment. And there's no indication in the indictment that those were only people from Arizona. So I think the indictment left the question wide open as to the effect of the defendant's spam, porn spam conspiracy. Well, that seems inconsistent with your saying it's really not an Internet case. Well, it's not inconsistent because it was the defendants who chose who to send the e-mails to. Just like in Hamling, it was those defendants who chose who to mail brochures out to. These defendants chose who to e-mail. They could have e-mailed, say they got these e-mails, they argue in their brief, well, you can't tell by an e-mail address where the person who received that e-mail address lives. And that may be true just looking at the e-mail address. But you could certainly e-mail those people and say, hi, we would like to send you pornographic spam advertisements or pornographic advertisements. But first we need to know what state are you located in. Please respond and let us know if you would like to receive these e-mails. They didn't do that. That wasn't their interest. These defendants, their whole conspiracy in this case was as soon as the CAN Spam Act went into effect and they knew about or actually when it was proposed in Congress, they said, uh-oh, this million-dollar business that we have just established in 2003 and made $1.2 million, it is about to become illegal. What are we going to do? Well, I have an idea. Let's set up a server in Amsterdam and let's route all of our e-mails through Amsterdam so that when people in the United States receive them, they'll think it's all coming from Amsterdam. We'll register the domains in Mauritius and we'll use IP addresses registered to a corporation in Amsterdam. We won't work directly for any of these companies, so nobody will ever be able to figure out that it's actually us in Phoenix sending these e-mails. So their whole conspiracy was to hide from their criminal conduct. They didn't care who they e-mailed. They didn't care because they didn't think they would ever get caught, frankly, the chances. I don't think you can send e-mail without some form of a computer. No, I don't think you can send e-mail without using the Internet. Well, and I don't mean to suggest that no aspect of the case involves the Internet. Clearly, that's not my suggestion. My point is that if the Court were inclined to say, yes, there may be a case where a national standard could be appropriate, this isn't that case. First, because in this case, the defendants didn't request that instruction, and so we're looking at Judge Campbell's decision under plain error analysis. But even if they had requested it, my point is this isn't like a website where the defendants can't control who comes to the website and looks at the material. This is a situation just like in Hamline, where these defendants chose to spam particular individuals' e-mail addresses. So they purposely availed themselves, and they basically took the risk that they would have to answer to the community standards of all of the different people who they spammed. I don't know how much time I have remaining, but... Do you think you've covered the waterfront? Well, just on that one issue, but I would be happy to address the can-spam arguments. You've basically responded to what the other side argued, I think. It's your time. You can use it as you wish. Okay. Well, I'm never one to give up time in terms of having an opportunity to persuade a court, so I guess I'll move on to the Can-Spam Act and address the defendants' arguments regarding the Can-Spam Act. Now, if you do that, they can respond. If you don't, they can't. It's up to you. But, of course, we rely on the briefs. Sure. Yes. Well, I guess what I would like to do is respond to a few things they wrote in their reply brief specifically, because we haven't had a chance to respond to that. Now, first, with regard to the Can-Spam Act, the Ninth Circuit has held, this has never been required when it comes to crafting statutory language that would apply. In the Can-Spam Act here, these defendants, they don't have a credible as-applied challenge. They can't say, we didn't know the Can-Spam Act applied to us because we have e-mails that we admitted at trial where they talk about the Can-Spam Act and say, oh, no, what are we going to do? I have an idea. Let's mail from Amsterdam. So they knew about the Can-Spam Act. That's not contested. We presented evidence about that at trial. They knew it applied to them. There's an e-mail in the record that we provided that the court can review where one defendant actually says to another, well, the most they could claim about our domain registration information registered under the name of Ganymede Marketing is that it's false. So they knew they had false registration information. And the only argument, really, that these defendants have made on appeal that says, well, as applied to us, the statute is unconstitutional, is because they point to these e-mail addresses of the defendant. And they say, well, because these e-mail addresses of the defendant were working e-mail addresses, there is theoretically a way that somebody could have contacted us. And I guess what they're asserting is that had a complaint been received at that e-mail address, they actually would have responded. Now, that's contrary to the evidence presented at trial, because at trial we brought in not only that there were 670,000 complaints to AOL and the FTC, but that these defendants sent back and forth e-mails joking, hey, we only got 13,000 complaints today. We're doing pretty good. So to suggest that if they had gotten an e-mail, they actually would have responded to it is ridiculous. But also, more importantly, to suggest that the defendant Kilbride, of all people, would have gotten an e-mail and then responded and said, yes, my name is Jeffrey Kilbride. I live in Los Angeles, California. I'm working with these five people in the United States to send these form spam messages, and here's how you can contact me in the future, is preposterous. This is a man who purposely set up a corporation in the island of Mauritius, because it had no e-mail spam commerce laws, and then did everything he could to distance himself from that corporation. He said, yes, Ganymede Marketing, they will receive all the proceeds of our spam, but we're not going to work directly with Ganymede Marketing. We're going to set up these sham consulting agreements, and we're going to work for this company called the Compliance Company, which is in the Isle of Man, and that And he gets a phone call from Mauritius, and I hope the Court will look at the e-mail he writes to InterOcean Management after he gets a phone call. It has some very colorful language. And he's angry because they called him from Mauritius. And so he's suggesting, well, we have these working e-mail addresses. They could have identified. They could have e-mailed and identified. There's a couple other problems factually with that argument. First, those e-mail addresses were not included in the header information of the e-mails, the spam e-mails. So even if those e-mail addresses are correct, that doesn't help the defendants on their header information argument under Section 1037A3. It only might work for their false domain registration information. So what the defendants did is they had all these e-mail addresses that they registered under the name of the Ganymede Corporation with various domain registrars. And in that information that they provided to the domain registrars as to who they were, they listed Ganymede Corporation, and they made up a fake name, Harry Plimpton. Nobody exists under that name. They used an address in the island of Mauritius. They provided a non-working phone number, and then they had these e-mail addresses that they point to on appeal and say, those e-mail addresses worked. The problem with that is the CAN-SPAM Act requires that a recipient of the e-mail or an ISP or a law enforcement agency be able to respond, locate, or identify the senders of the e-mail. And even if those e-mail addresses were working, as the defendants suggest, it wouldn't have helped anybody respond to the spam messages that the defendants were sending because the e-mail address wasn't included in the header information and the spams. A recipient of the e-mail would have to go, okay, I've got this spam message. I want to make these people stop spamming me because, by the way, the opt-out link that the defendants provided in their e-mails, it didn't work, and they put everybody back in the address pool who had opted out and spammed them all over again. So how am I going to find these guys? Well, if they knew enough about e-mail to show the full header information of an e-mail, they could figure out, they could see what's the from address. Well, the from address was a non-working, totally made-up e-mail address, according to the testimony of Jennifer Claussen, who pled guilty to conspiring with the defendants in their porn spam conspiracy. And the so if they had looked at that e-mail address, they couldn't have replied to the e-mail address. It was non-working. The from line and the reply to, both made-up, non-functioning e-mails. No way to get in touch with the defendants. If they knew what an IP address was, and they could see that in the header information, and they knew that there were websites available that you could go look up IP information, and they had gone and done that, what they would have found is that the IPs that the defendants used to send their e-mails were all registered to a company called Cobalt Networks, and an address of Amsterdam was provided. Well, none of these defendants, the defendants or their co-conspirators, were working for Cobalt Networks when they sent the e-mails. As I explained before, they had these consulting agreements with the compliance company instead. So there was no way that a recipient of their e-mails could figure out who was sending the e-mails, could respond to them, or could locate them based on the header information. Absolutely impossible. And going back to the domain registration information, if a recipient of the e-mail said, okay, I can't figure it out based on anything in the header, but I see that there's this domain in the e-mail that was used to send the message, I'm going to look up on a publicly available website who that domain is registered to, and they went and did that, they would have found Harry Plimpton, who doesn't exist, an address in Mauritius of Ganymede Marketing, who the defendants purposely did not work for, and they would have found a nonworking telephone number. So there, again, would be no way to respond, locate, or identify Kilbride. So even if these e-mail addresses that defendants point to were working in, even assuming defendant Kilbride actually responded to a complaint. Sotomayor, before you finish, is what the government's justification for the obstruction of justice enhancement is? I'm very glad you brought that up, Judge. What happened is that a month before trial, the government made contact with Laval Law, who was a co-conspirator of the defendant. He is a citizen of Mauritius. He was the one of the directors of this Ganymede Corporation shell company that the defendants set up. He had never personally met the defendants, but he had agreed to help them establish the shell corporation, and that's what he does for a living in Mauritius. When we contacted, we, the government, contacted Mr. Law, he indicated, I can't, under Mauritius law, speak to you about the trusts that the defendants may or may not have had in Mauritius, but I can talk to you about Ganymede marketing. And we said, that's fine. We want to talk to you about Ganymede marketing. The defendants received a copy of that correspondence between the government and Mr. Law, including Mr. Law's statement and limitation of what he could testify about. Notwithstanding knowing that Mr. Law would not testify about the trusts, defending Kilbride hired a lawyer in Mauritius, a very powerful, reputable lawyer in Mauritius, who went to the Supreme Court of Mauritius and sought an injunction ordering Mr. Lavalla to appear in court in Mauritius when he knew that Mr. Lavalla was scheduled to testify as a witness for the government. There is no testimony in the record as to, and no evidence in the record regarding whether our standing rules apply in Mauritius, but I argued to the district court that the defendant, Kilbride, had no standing to get that injunction. He got the injunction on behalf of Ganymede. He didn't work for Ganymede on purpose, right? He wasn't a director of Ganymede. He wasn't employed by Ganymede. So how can he go into court? That would be decided under which law? Well, that is a question of Mauritius law. But the United States has held, that even a lawful lawsuit can be grounds for obstruction of justice if it is used to harass or intimidate a witness. How is it, is this different from a wife reminding a husband that there is a marital privilege, plus to a criminal trial? This wasn't a reminder. It was an order to appear in a different country when they knew the defendant, the witness had accepted service, hired a local lawyer in Arizona, and already indicated he would not testify about the matters they sought the injunction to prevent him from testifying. They ordered him to appear in Mauritius so he couldn't get on the plane and come to the United States. They were trying to prevent him from testifying. In fact, they had their Mauritius lawyer call him up and say, you shouldn't testify in this case and you should not travel to the United States. And thankfully, Mr. Law had legal counsel and was smart enough, man, to say, okay, legal counsel, I'm going to appoint you to appear in court on my behalf in Mauritius so that I can still make good on my obligation to the United States government since I, my lawyer, accepted a subpoena and I'm going to travel to the United States anyway. And then when he came, he said to me, I can't talk to you because there's an injunction in my country that prevents me from talking to you, and if I violate that, I'm going to be held in contempt as soon as I return home. Only if he didn't testify in the United States, he would be held in contempt  So they put him in this catch-22 situation. And it was all done so that Mr. Law would not testify, would not travel to the United States. And in fact, as soon as it became known by Judge Campbell that the defendants had done this, they dropped the injunction in Mauritius. They said, oh, Judge, we'll drop the injunction. And so that's how you know. Thank you, Judge. Roberts. Roberts. What the government has done today in your argument is what they did at trial, which is argue essentially that because Mr. Schaefer and Mr. Kilbright are spammers and the spam consists of pornography, there's a porn-spam conspiracy. Unfortunately, pornography is not illegal and spam is not necessarily illegal. So by painting this picture that this was spam, there was hundreds of thousands of spam, and somehow this Court must find they're guilty of obscenity. The government has told this Court that this is not an Internet case. Fine. Well, it is. But putting that aside, you know, John Adams said facts are a stubborn thing. No matter how much you want them to be different, no matter how much you wish them to be different, they don't change. But this is an Internet case. But whether it's an Internet case or it's not an Internet case, there's a law that has to be applied. It's either the existing law, which is Miller v. California, which talks about local community standards. Under that standard, no way, no how is it allowed, is it permissible for the personal opinions of people outside the district to testify as to whether they thought something was pornographic or obscene. Again, even people inside the district can't. Now, what's the purpose of having these people complain? Well, it's only to prejudice people. Pardon me? Well, no. What's the purpose of people testifying in court that they thought something was shocking, disgusting, such as from Ames, Iowa, and Boston, Massachusetts? The government today has told you, well, they were asked for some other reason. But I'm reading from her closing argument. This is Appellant's Excerpt from Record, Volume 2, page 104, where the prosecutor argued, this very prosecutor argued, The judge also instructed you that you may consider evidence of standards existing in places outside of this particular district. You heard testimony from witnesses in Boston, in Iowa, in addition to Arizona. You should consider the evidence presented. And it goes on. So it's disingenuous to argue that, oh, they were brought in for some other reason. They were brought in to testify about their personal opinions to get to give a hodgepodge of the standards in this case. It's either local or it's national. I'm not a constitutional lawyer. I'm a trial lawyer. How do you try a case? What would be the effects of trying this on a case with this unprecedented instruction where you get the personal opinion of people outside the district? If those personal opinions matter and there was some obscenity law violated in Ames, Iowa, or Boston, Massachusetts, there was no objection to this testimony. I think there was. I mean, I think there was an objection as relevance. There's a 402 objection. But notwithstanding, the instruction itself is just clearly erroneous. It's just plainly wrong for mixed people in a local district to consider the personal opinions of people outside the jurisdiction. That's never, ever happened before in the history of the United States of America. A community is always defined. There has to be some community. It's not – it's either the national community, which this Court may decide to – to decide as a proper community. But I'm not even asking this Court to go that far, because this Court doesn't have to go this far – that far to reverse this case and send it back. This instruction was clearly wrong. It's never, ever happened before. You didn't object to that instruction, however. There was an objection to that instruction. And the government argued that is for a different reason. But I'm reading from the excerpts of the record, and that's – it's from the government supplemental excerpts of record, page 7. It says, this is a court stating, I have added to the obscenity instruction the statement that evidence of standards outside the geographic district may be considered. I think that's a correct statement under the Hamling decision, which we disagree with. I did not adopt your proposed instruction, Mr. Black, on obscenity. You are on the record objecting to the version I had adopted. That's the record that I've read. But notwithstanding whether anyone objected or not, this is something where it's an absolute miscarriage of justice. And you – did you suggest the instruction you wanted? I was not the trial lawyer. Did the trial lawyer? No. No. This was a situation where – we had a situation where – and I think from a trial lawyer's perspective, how – if this court allows this instruction to be sanctioned, then what happens is – here's what happens at the next trial. They bring in a witness from Ames, Iowa to testify about his personal opinion. I then have to go find 50 people from Ames, Iowa to testify about their personal opinions. Then the government goes and finds another 100. The personal opinions are always going to be irrelevant because they've always been irrelevant in any obscenity prosecution. And they were brought in to prejudice the jury, and the instruction was just clearly erroneous. I mean, it's something where how the heck could you ever try a case again under this instruction because it would just be numbers. Who has the most witnesses, not the standards? Because remember, the community standards of Ames, Iowa wasn't brought in. It was just one person's opinion. The community standards. The clients have avoided prosecution by providing a gate. I'm sorry? You know, you spam someone and say, I've got some great pornographic pictures, but tell me that you're over 18 and that you'd actually like to see them, and they'll come right to you. Absolutely not. Absolutely not. Because, again, what's happening here is a conflation between spamming and obscenity. You know, someone may not want spam. That is not obscenity. It doesn't have to be obscenity to be spam. And so you have a situation where, you know, someone may want. Let's say you e-mail someone, I have some pornographic images, and they consist of what was at record in this case, two images. And someone says, yes, I want it. So it's permissible. But in that jurisdiction, let's say it's Boise, Idaho, the community standards are such that even though someone wants that image, they still could be convicted of obscenity, possession of obscenity, and the sender still could be convicted for transmitting that. So permission has nothing to do with it. You know, whether – permission has nothing to do with the issue of obscenity, and that's what happened in this case, is a government conflating the unwanted image with whether something's obscene. If it's unwanted, it's spam, period. And there's punishments for spam. If it goes beyond a certain level and it happens to be obscene, judged by a community, a local community. So in this situation, by conflating the two, you have these are bad people, therefore they're guilty of something. And that's really what happened in this case. And I urge this Court to, again, to just reinforce the existing case law under Miller, which is you have to be convicted by a local community standard. Here we don't have that. It doesn't mean random communities. It doesn't mean Ames, Iowa, or Boston, Massachusetts. It means some relationship to the community. Or if the Court wants to go a step further and say, you know something, in this Internet day and age, it's really hard to determine what the community is in an Internet case, which this is. Therefore, I know it when I see it. By my count, you're about as much over your time for argument as your opposing counsel was, so I'm going to ask you to stop there. Thank you both for your arguments. It's an extraordinarily interesting case. It's submitted for decision. Thank you very much, Your Honors. Thank you.
judges: Hug, Fletcher B. , Hawkins